UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-61290-CIV-COHN/SELTZER

ANTHONY CHASE,

    Plaintiff,

vs.

NOVA SOUTHEASTERN UNIVERSITY, INC.,

    Defendant.
_____/

### ORDER ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS

THIS CAUSE is before the Court on Plaintiff's Motion to Compel In Camera Inspection [1] and Production of Items Listed on Defendant, Nova Southeastern University, Inc.'s Privilege Log to Plaintiff Anthony Chase's Discovery Request (DE 20) and the Court being sufficiently advised, it is hereby ORDERED that the Motion is DENIED for the reasons set forth below.

Factual and Procedural Background

Plaintiff Anthony Chase was employed as a tenured law professor by Defendant Nova Southeastern University, Inc. ("Defendant," the "University," or "NSU"); he worked for the University for approximately 31 years. Sometime in the fall of 2010, multiple faculty members brought to the University's attention that Plaintiff had been sending them emails

---

[1] Although Plaintiff's Motion is styled (in part) "Motion to Compel In Camera Inspection. . . ," nowhere in the Motion has Plaintiff requested that the Court conduct an *in camera* review. Nor does the Court find that such a review is necessary, particularly as Plaintiff is generally challenging the nature of attorney Panza's role in the investigation.

in which he referenced, *inter alia*, possessing a gun and shooting on campus.² In response, on October 7, 2010, the University placed Chase on administrative leave. Additionally, in October 2010, the University requested that its outside general counsel, Thomas Panza, of the law firm of Panza, Mauer, & Maynard (the "Panza law firm"), conduct an investigation and render legal advice as to the complaints and allegations involving Chase. As part of the investigation, attorney Panza interviewed 11 faculty members, the dean of the law school, a maintenance employee, and Chase (on two occasions). At the conclusion of the investigation in November 2010, Panza submitted to the University a "Confidential Executive Summary."

Thereafter, by a letter dated December 8, 2010, University President George Hanbury, II notified Chase that his employment had been terminated. The December 8 letter reads in pertinent part:

> On October 7, 2010 you were placed on paid administrative leave in response to serious issues that were brought to the NSU administration by multiple faculty members concerning references to guns and shooting. References to a gun were made verbally by you on September 17, 2010, while faculty members were discussing issues related to you living in your faculty office. References to a gun were also made by you in writing via emails attached as Exhibits A through D. Furthermore, you made reference in writing to shooting from the NSU Law Center into the parking lot via emails attached as Exhibit D. Your conduct created a well-founded fear by the University for the safety of its entire University community.

---

² These emails contain such statements by Chase as: "[I] have acquired a large Berretta handgun and I take my 'how to shoot' course Tuesday or Thursday morning of this week. . . ."; "I own a registered Beretta 8000 (which is legal in Florida), have a carry permit (which is also legal of course). My maintenance and use of this weapon and its possession conform to all federal and state laws, and to the rules and regulations of my employer"; "Just trying to avoid being shot. I can shoot pretty good from the windows into the parking lot." Emails attached to December 8, 2010 Letter (DE 20-5).

2

> As you are aware, the University has conducted an extensive administrative review of these matters. In addition to review of relevant information and documentation, the University's review included meetings with you on October 19 and November 17, 2010, at which times the relevant concerns were presented, including the emails referenced above, and an opportunity was provided for you to address same and respond as fully as you chose.
>
> This letter serves to inform you that (1) the University's review of this matter has concluded; and (2) it is the University's decision to terminate your employment, effective immediately, for exhibiting unprofessional conduct as a faculty member of NSU Law Center (See NSU Faculty Handbook, section titled *Dismissal for Cause*).

December 8, 2010 Letter (DE 20-5).

On June 6, 2011, Plaintiff Chase commenced this action against the University The Complaint asserts claims under the Americans with Disabilities Act ("ADA") (Count I) and the Florida Civil Rights Act of 1992 ("FCRA") (Count II). Plaintiff contends that Defendant terminated his employment because it perceived him as "sufficiently mentally ill to go on a campus shooting spree." Motion at 2 (DE 20). According to Plaintiff, "[t]aking an adverse employment action against someone who is wrongfully perceived as violent and dangerous is . . . a violation of the Americans with Disabilities Act. . . ." Id. at 5. Plaintiff also seeks Declaratory and Injunctive Relief based on an alleged breach of an employment contract for lifetime employment as a tenured professor (Count III).

## Parties' Arguments and Court's Analysis

In response to one of Plaintiff's interrogatories,[3] Defendant produced a privilege log

---

[3] This interrogatory requested Defendant to "identify any and all documents (by author, date, subject matter and custodian reviewed and/or created in the decision making process, or created afterward to explain or memorialize Anthony Chase's termination." Interrogatory No. 5(c) (DE 20-1).

3

indicating that certain documents had been withheld from production based on the attorney-client privilege and the work product doctrine. See Amended Privilege Log (DE 20-4). Plaintiff moves the Court to compel the production of the following documents identified on Defendant's Amended Privilege Log, contending that they are not protected by either privilege:

(1) the Witness Interview Summaries of 11 law professors and a facilities maintenance employee dated between October 13 and October 15, 2010 and the Witness Interview Summary of the dean of the law school dated November 2, 2010, prepared by the Panza law firm;

(2) the November 2010 Confidential Executive Summary, prepared by the Panza law firm;

(3) the October 28, 2010 Confidential Memorandum from Frank DePiano, University Provost and Vice-President for Academic Affairs, to attorney Panza;

(4) the November 2, 2010 (10:15 a.m.) email from Mark Jones, the University's Vice-President for Human Resources, to attorney Panza, the subject of which is "Tony Chase";

(5) the pre-December 8, 2010 portion of the multiple emails beginning in September 2010 between Mark Jones and/or the Panza law firm and University employees "concerning the allegation that Chase had violated law, rule, regulation, standard of conduct, policy or performance standard.

Standard of Review

As an initial matter, the Court notes that because this action arises under the ADA (with a pendant state claim), both the attorney- client privilege and the work product doctrine are governed by federal law. See Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992) ("Courts that have confronted this issue in the context of the discoverability of evidence have uniformly held that federal law of privilege governs even where the evidence sought might be relevant to a pendent state claim."); Rally Mfg. Inc. v. Federal-Mogul

4

Corp., No. 10-23791-Civ, 2011 WL 2938270, at *1 (S.D. Fla. July 21, 2011) (Torres, M.J.) ("The federal common law of privilege applies to all claims in a federal question case."); Alleyne v. New York State Educ. Dept., 248 F.R.D. 383, 386 (N.D.N.Y 2008) ("Federal privilege law controls when a complaint asserts both federal and state claims.").

The attorney-client privilege is the oldest of the privileges protecting confidential information. Its purpose "is to encourage open and complete communication between a client and his attorney by eliminating the possibility of subsequent compelled disclosure of their confidential communications." United States v. Noriega, 917 F.2d 1543, 1550 (11th Cir. 1990). "[T]he attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn Co. v. United States, 449 U.S. 383, 390 (1981).

In the Eleventh Circuit, a communication between an attorney and a client is protected only if it is "intended to remain confidential" and "under the circumstances was reasonably expected and understood to be confidential." Noriega, 917 F.2d at 1551 (quoting United States v. Bell, 776 F.2d 965, 971 (11th Cir.1985)). The privilege, however, protects only the disclosure of confidential communications; it does not protect the disclosure of the underlying facts. Upjohn, 449 U.S. at 395. To invoke the privilege, the claimant must establish the following:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an

>opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. Noriega, 917 F.2d 1543, 1551 (11th Cir. 1990).

The attorney-client privilege applies not only to individuals, but also to corporations (and other entities). "When a corporation is a client, communications between any corporate employee, acting within the scope of his corporate duties, and an attorney for the corporation through which the corporation may obtain legal advice, may be privileged." Rally Mfg., 2011 WL 2938270, at *2 (quoting Knights Armament Co. v. Optical Sys. Tech., Inc., No. 6:07-cv-1323-Orl-22KRS, 2009 WL 331608, at *2 (M.D. Fla. Feb. 10, 2009) (citing Upjohn, 449 U.S. at 394).

The work product doctrine, first articulated in Hickman v. Taylor, 329 U.S. 495 (1947), has been codified in the Federal Rules of Civil Procedure. More specifically, Rule 26(b)(3) provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorneys, consultant, surety, indemnitor, insurer, or agent." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added). "Such materials, however, are not protected if they are assembled in the ordinary course of business or other non-litigation purposes." Developers Surety and Indem. Co. v. Harding Village, Ltd., No. 06-21267-Civ, 2007 WL 2021939, at *2 (S.D. Fla. July 11, 2007) (Brown, M.J.).

The work product doctrine, however, is qualified. A party may obtain work product materials if "they are otherwise discoverable under Rule 26(b)(1)" and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue

hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i and ii). Moreover, if a court requires production of work product materials, "it must protect against disclosure of the mental impressions, conclusions, opinions, or other legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). See also Cox v. Admin'r United States Steel & Carnegie, 17 F.3rd 1386, 1441-42 (11th Cir.), modified on other grounds, 30 F.3d 1347 (11th Cir. 1994) ("[W]ork product containing an attorney's opinions, mental impressions, conclusions, and legal theories enjoys nearly absolute protection.").

The burden of demonstrating the applicability of both the attorney-client privilege and the work product doctrine rests on the asserting party. Bogle v. McClure, 332 F.3d 1347, 1358 (11th Cir. 2003); Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.2d 124, 138 (3rd Cir. 2000); Jackson v. Geometrica, No. 304CV640J20HTS, 2006 WL 510059, at *1 (M.D. Fla. Mar. 2, 2006). To meet its burden, Defendant (which is asserting the privilege and doctrine here) has submitted the affidavit of attorney Panza (DE 23).[4]

In his Affidavit, attorney Panza attests that he is now, and was at the time of the investigation of the allegations against Chase, outside general counsel to Nova Southeastern University ("NSU").[5] He further attests that as general counsel, he "render[s] legal advice and counsel to NSU"; his "position as outside general counsel involves only

---

[4] Defendant has not docketed Attorney Panza's Affidavit as a separate attachment to its Response (DE 23); rather, it is as docketed as part of the Response, commencing on page 20.

[5] Attorney Panza also "hold[s] the position at NSU as Special Assistant to the President." Panza Aff. ¶ 3. He attests that "during the course of the investigation, [he] was acting in [his] capacity as general counsel, and not as Special Assistant." Id. ¶ 4. Plaintiff does not contend that Panza was acting as Special Assistant during the investigation.

7

legal responsibilities." Panza Aff. ¶ 3  Additionally, attorney Panza attests that in October 2010, NSU requested "the law firm of Panza, Maurer & Maynard, as general counsel . . . to conduct an investigation into complaints and allegations involving Plaintiff, Anthony Chase, and to provide legal advice as to the complaints and allegations." Id. ¶ 4. According to attorney Panza, "from [his] perspective, the purpose of the investigation was to determine the factual circumstances surrounding the allegations in order to render informed legal advice and in anticipation of future litigation." Id. ¶ 7. "Throughout the course of the investigation, he viewed [his] role and the role of Panza, Maurer & Maynard as that of legal counsel preparing legal advice in connection with the allegations, and with regard to resulting litigation." Id. ¶ 14.

In his Affidavit, attorney Panza also addresses the documents Plaintiff now seeks. With respect to the summaries of witness interviews, Panza states: "As part of the investigation, [he] along with an associate from [his] law firm interviewed 13 NSU employees, including Michael Flynn, Kathy Cerminara, Phyllis Coleman, Joel Mintz, Katherin Arcabascio, Timothy Acaro, Joseph Harbaugh, Richard Corbyons, Joseph Hnylka, James Wilets, Jani Maurer, Michael Dale, and Athornia Steele."[6] Id. ¶ 9. According to Panza, "a representative from Human Resources at NSU was present at all of the above interviews except for that of Michael Dale and Athornia Steele." Id. Attorney Panza additionally attests that his "law firm prepared a summary of each interview for the purposes of informing NSU of the information obtained, rendering legal advice to NSU, and

---

[6] Of these 13 individuals, one is a facilities maintenance employee (Richard Corbyons) and one is the dean of the University's law school (Arthornia Steel); the remaining individuals are professors.

8

in preparation for potential litigation" and that "[t]he summaries also contain the law firm's mental impressions, opinions and thoughts as reflected in the questions asked and the follow up questions to the responses received." Id. ¶ 10.

With respect to the October 28, 2010 Confidential Memorandum and the November 2, 2010 email, attorney Panza attests that "he instructed Frank DePiano, the Vice President of Academic Affairs, and Mark Andrew Jones, Vice President of Human Resources, to prepare memoranda in order to aid in [his] investigation. . . . Frank DePiano provided his summary in the form of a confidential memorandum, and Mark Jones provided his summary via email." Id. ¶ 11.

As to the pre-December 8, 2010 emails relating to the "investigation performed concerning the allegation that Chase had violated [a] law, rule, regulation, standard of conduct, policy or performance standard," attorney Panza explains that "[d]uring the course of the investigation, there were a number of email correspondences between him and/or Mark Jones [Vice President of Human Resources] and NSU employees." Id. ¶ 12. He additionally attests that "these emails related to the investigation [he] was performing concerning the allegations, and were used to aid in the formulation of legal advice on the subject." Id.

Finally, with respect to the confidential executive summary, attorney Panza attests that "after Panza, Maurer & Maynard concluded its investigation, it prepared a Confidential Executive Summary advising its client, NSU, of its factual and legal analysis of the allegations giving rise to the investigation." Id. ¶ 13.

Defendant argues that the documents at issue are protected by the work product doctrine because they were prepared in anticipation of litigation. "Litigation need not be a

9

certainty for work product protection to arise." Bickler v. Senior Lifestyle Corp., 266 F.R.D. 379, 383 (D. Ariz.2010).  Rather, "[d]ocuments are prepared in anticipation, and consequently protected by the work product doctrine, if 'in light of the nature of the document and the factual situation in the particular case the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"[7] Developers Surety, 2007 WL 2021939, at *2 (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice and Procedure, § 2024 at 343 (1994)).  In his Affidavit, attorney Panza explains why the documents sought were prepared in anticipation of litigation:

> The complaints and allegations were of a serious nature; and since the Plaintiff was a salaried tenured law professor, an attorney, and had worked for NSU for approximately 31 years, any adverse action that may be taken against Plaintiff following investigation into the accusations had a high likelihood of leading to litigation.

Panza Aff. ¶ 8 (DE 23).

By contrast, Plaintiff argues that the documents at issue should be produced because "the primary purpose of the investigation was not . . . to prepare for reasonably foreseeable litigation. . . ."  Plaintiff characterizes the purpose of the investigation as a "mixed bag" that included – according to one of Defendant's interrogatory answers – the following: "identifying safety risks, remedial, risk management, disciplinary and in anticipation of litigation."  Motion at 18 (DE 20).  Plaintiff further argues that the primary purpose of the investigation was to obtain business, not legal advice.  See Alleyne, 248 F.R.D. at 387 ("[R]ecords prepared in the ordinary course of business are not protected

---

[7] The court in Developers Surety noted that "[a]lthough the Eleventh Circuit has not specifically adopted this formulation, it has been adopted in a significant majority of other circuits."  2007 WL 2021939, at *2 n.1 (collecting cases).

because they are not prepared in anticipation of litigation.").

Documents created with more than one purpose, however, may still be afforded work product protection. "Where there are multiple purposes for creating a document, a document is protected by the work product doctrine if, 'taking into account the facts surrounding [its] creation, [the] litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole.'" Developers Surety, 2007 WL 2021939, at *2. "In other words, even if a document has some purpose within the ordinary course of business, the document is protected as work product if it is substantially infused with litigation purpose." Id.; see also In re Trasylol Prods. Liab. Litig., No. 08-1928-MDL, 2009 WL 2575659, at *4 (S.D. Fla. Aug. 12, 2009) (Middlebrooks, J.) ("'Dual purpose' documents created because of the prospect of litigation can be protected even though they were also prepared for a business purpose.")

After carefully considering the parties' arguments, the Court finds that all documents sought by Plaintiff are protected from disclosure by the work product doctrine. First, as attorney Panza has attested, all the documents at issue were prepared either by Defendant's counsel or at his direction. Moreover, under the facts of this case, the Court finds that at the time the documents were created, there was more than a remote chance that litigation would ensue; indeed, litigation was highly likely. Plaintiff was a high-salaried and tenured law professor, who was also an attorney; he had worked for the University for more than 31 years. Finally, the serious nature of the complaints against Plaintiff could warrant significant disciplinary action, including termination of his employment. Accordingly, Defendant and its counsel had an objectively reasonable basis to anticipate litigation.

Furthermore, even if the investigation and concomitant documents had more than

one purpose that would not preclude the application of the work product doctrine here. The Court finds that the litigation purpose of creating the documents "so permeates any non-litigation purpose that [other purposes] cannot be discretely separated from the factual nexus as a whole." Developers Surety, 2007 WL 2021939, at *2. Stated differently, the litigation purpose was so intertwined with the other possible purposes – safety, remedial, risk management, and discipline – that the purposes cannot be discretely separated from the factual nexus as a whole.[8]

Because the Court finds that the documents at issue are protected from disclosure under the work product doctrine, it need not decide whether the documents are also protected by the attorney-client privilege.

DONE AND ORDERED in Fort Lauderdale, Florida, this 18th day of June 2012.

_____
BARRY S. SELTZER
CHIEF UNITED STATES MAGISTRATE JUDGE

Copies to:

All counsel of record

---

[8] In his Reply, Plaintiff argues that the crime-fraud-tort exception requires production of the documents at issue. The Court finds that this argument is plainly without foundation. The argument, therefore, does not warrant any discussion except to note that nothing in the record even suggests that Defendant or its counsel engaged in any fraudulent, criminal, or otherwise improper conduct with respect to the attorney-client relationship.