UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 11-61290-Civ-Williams/Seltzer

ANTHONY CHASE,

     Plaintiff,

vs.

NOVA SOUTHEASTERN
UNIVERSITY, INC., a Florida, not-
for-profit corporation,

     Defendant.

_____/

## Plaintiff's Response to Defendant's Motion for Summary Judgment

Plaintiff, Anthony Chase, responds as follows to the Defendant's Moton for Summary Judgment ("Defendant's MSJ"), DE 84:

### Introduction and Summary

This case involves the wrongful discharge of a tenured, but highly idiosyncratic, law professor, Anthony Chase, whom Nova Southeastern University, Inc. ("Nova") fired after Professor Chase made several remarks and wrote several e-mails about buying a gun and legally obtaining a Florida concealed-weapon permit because, according to Nova's president, what Professor Chase had said and written had "created a well-founded fear by the University for the safety of its entire University community."

Nova fired Professor Chase following an investigation during which no psychological or psychiatric examination was performed, but during which its University Counsel questioned Professor Chase extensively about his allegedly residing in his office, which was "cluttered" with thousands of books that Professor Chase had amassed; walking about the hallways in a bathrobe or bare feet; emitting body odor; using a pen knife to carve cheese off of a block during faculty meetings; squirting aerosol whip cream into his mouth during faculty meetings; and doing his university-funded research into art-vs.-obscenity by visiting what the University Counsel referred to as "porno" sites on the Internet.  At least one of the law school's associate deans and two of the professors quoted as complaining about his e-mails and remarks were aware that Professor Chase had been under psychiatric care for 20 years.

Professor Chase sues under the Americans with Disabilities Act ("ADA") and the handicap-discrimination provisions of the Florida Civil Rights Act ("FCRA") based on Nova's having fired him because its management clearly perceived him to be mentally ill enough to go on a campus shooting rampage — which Professor Chase's expert clinical psychologist stated is, **First**, an incorrect assessment of his mental state, based on a comprehensive psychological evaluation the expert performed, but, **Second**, is the only inference to be drawn from the language used in the president's termination letter.  This is especially likely, the expert testified, given the overlay of the perceptions of Professor Chase's unconventional mannerisms on the reality

that all of those persons who have engaged in mass shootings have been documented as suffering mental illness.

Professor Chase also sues for declaratory and other relief concerning his discharge from the "lifetime relationship" that Nova's law school faculty handbook boasts springs from a "job security inherent to the tenure contract" so that "the faculty member will be unencumbered in making a total commitment to perfecting his/her professional stature by advancing the development of the law at a state or national level through teaching, scholarship and service...."

While the Law Center Faculty Handbook provides no mechanism for the termination of a tenured professor, the general Faculty Policy Manual provides a termination mechanism, and a review process, for "a faculty member on a continuing contract, probationary, or annual appointment," noting that "[t]he Law School has a tenure system which differs from the continuing contract process..."

Nova, meanwhile, has produced no admissible evidence that Professor Chase:

**One**, committed — or even threatened to commit — an illegal act;

**Two**, actually instilled fright in any of those persons to whom he spoke or wrote — not a single one of whom either testified to that fact in a deposition or submitted an affidavit or declaration; or

**Three**, was afforded any process by which his "lifetime relationship" with Nova might be legally severed.

Meanwhile, George Hanberry, II, the president of Nova, has offered no rationale for having terminated Professor Chase other than what he stated in his letter — which he argues conclusorily does not evidence any consideration of Professor Chase's mental status.

## Applicable Legal Standards

- **For granting summary judgment**

"The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986)(citations omitted).   "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party."  <u>Id</u>. (Citations omitted.)

"The burden of persuasion imposed on a moving party by Rule 56 is a stringent one....  Summary judgment should not be granted unless it is clear that a trial is unnecessary, ... and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party..."  <u>Id</u>. at 331, n. 2 (citations omitted).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Federal Rule of Civil Procedure 56(c)(1).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed.R.Civ.P. 56(c)(2).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed.R.Civ.P. 56(c)(4).

• **For making a case of perceived-disability discrimination**

The ADA, 42 U.S.C. § 12101, et seq., and the FCRA, § 760.01, et seq., FLA. STAT. (2011), each protect from employment discrimination, § 12112 and § 760.10(1), "qualified individual[s] … who … can perform the essential functions of the employment position that such individual holds or desires."  § 12111(8).[1]

"The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."  Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000)(citation omitted).  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful

---

[1]Although the FCRA simply refers to an individual who suffers a "handicap," Florida courts historically have read into the rather bare-bones Florida statute the provisions and gloss of § 501 or 504 of Title V of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794, and the ADA.  See e.g., St. Johns County Sch. Dist. v. O'Brien, 973 So. 2d 535, 540 (Fla. Dist. Ct. App. 2007); Greene v. Seminole Elec. Coop., 701 So. 2d 646 (Fla. Dist. Ct. App. 1997).  Florida courts construe the FCRA handicap provisions similarly to the ADA and Rehabilitation Act.  O'Brien, citing Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000).

discrimination because of her disability." <u>Id</u>. (Citation omitted.)

"[D]isability-discrimination claims under the FCRA are analyzed using the

same framework as ADA claims." <u>Holly v. Clairson Indus., L.L.C.</u>, 492 F.3d

1247, 1255 (11th Cir. 2007).

- **How to show 'disability'**

Not only are persons who suffer "a physical or mental impairment that

substantially limits one or more major life activities" § 12102(1)(A)," such as,

<u>inter alia</u>, "thinking, communicating, and working," § 12102(2)(A), protected

by the ADA/FCRA, but also those persons who have "a record of such an

impairment" § 12102(1)(B), or are "regarded as" suffering such an

impairment.  §§ 12102(1)(C) and (3).  This includes an employee whose

"supervisors believed, without foundation, that his mental impairment made

him a potential safety risk to his coworkers." <u>Quiles-Quiles v. Henderson</u>, 439

F.3d 1, 6 (1st Cir. 2006) ("The belief that the mentally ill are

disproportionately dangerous is precisely the type of discriminatory myth that

the Rehabilitation Act and ADA were intended to confront"). <u>See also Stradley</u>

<u>v. Lafourche Communications</u>, 869 F. Supp. 442, 444 (E.D. La. 1994)

(reasonable jury could determine that plaintiff was regarded as "not fit to

work in any job" by supervisor, whose lay interpretation of what he

interpreted, based on his "general life experiences" and without discussion

with plaintiff's physician,  as acute anxiety and depression rendered the

plaintiff potentially violent and hostile in the workplace).

Making a case under the "regarded as" prong became a lot easier for a plaintiff under the 2008 Americans with Disabilities Act Amendments Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, concerning which Equal Employment Opportunity Commission, the agency charged with enforcing the ADA, issued a comprehensive interpretive guidance to the ADAAA, which stated in pertinent part as follows:

> ***Coverage under the "regarded as" prong of the definition of disability should not be difficult to establish.*** See 2008 House Judiciary Committee Report at 17 (explaining that Congress never expected or intended it would be a difficult standard to meet). ***Under the third prong of the definition of disability, an individual is "regarded as having such an impairment" if the individual is subjected to an action prohibited by the ADA because of an actual or perceived impairment that is not "transitory and minor."***
>
> This third prong of the definition of disability was originally intended to express Congress's understanding that "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual impairments, and [its] corresponding desire to prohibit discrimination founded on such perceptions." 2008 Senate Statement of Managers at 9; 2008 House Judiciary Committee Report at 17 (same). In passing the original ADA, Congress relied extensively on the reasoning of School Board of Nassau County v. Arline[, 480 U.S. 273, 282-283(1987),] "that the negative reactions of others are just as disabling as the actual impact of an impairment." 2008 Senate Statement of Managers at 9. The ADAAA reiterates Congress' reliance on the broad views enunciated in that decision, and Congress "believe[s] that courts should continue to rely on this standard." Id.
>
> Accordingly, ***the ADA Amendments Act broadened the application of the "regarded as" prong of the definition of disability.*** 2008 Senate Statement of Managers at 9-10. In doing so, Congress rejected court decisions that had required an individual to establish that a covered entity perceived him or her to have an impairment that substantially limited a major life activity. ***This provision is designed to restore Congress's intent to allow individuals to establish coverage under the "regarded as" prong by showing that they were treated adversely because of an***

***impairment, without having to establish the covered entity's beliefs concerning the severity of the impairment.*** Joint Hoyer-Sensenbrenner Statement[2] at 3.

Thus it is not necessary, as it was prior to the ADA Amendments Act, for an individual to demonstrate that a covered entity perceived him as substantially limited in the ability to perform a major life activity in order for the individual to establish that he or she is covered under the "regarded as" prong. Nor is it necessary to demonstrate that the impairment relied on by a covered entity is (in the case of an actual impairment) or would be (in the case of a perceived impairment) substantially limiting for an individual to be "regarded as having such an impairment." In short, to qualify for coverage under the "regarded as" prong, an individual is not subject to any functional test. See 2008 Senate Statement of Managers at 13 ("The functional limitation imposed by an impairment is irrelevant to the third 'regarded as' prong."); 2008 House Judiciary Committee Report at 17 (that is, "the individual is not required to show that the perceived impairment limits performance of a major life activity"). ***The concepts of "major life activities" and "substantial limitation" simply are not relevant in evaluating whether an individual is "regarded as having such an impairment."***

To illustrate how straightforward application of the "regarded as" prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability. Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability.

A "prohibited action" under the "regarded as" prong refers to an action of the type that would be unlawful under the ADA (but for any defenses to liability). Such prohibited actions include, but are not limited to, refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment.

Where an employer bases a prohibited employment action on an actual or perceived impairment that is not "transitory and minor," the employer regards the individual as disabled, whether or not myths, fears, or stereotypes about disability motivated the employer's decision.

---

[2]Statement of Representatives Hoyer and Sensenbrenner, 154 Cong. Rec. H8294-96 (daily ed. Sept. 17, 2008).

Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established only if an individual meets the burden of proving that the covered entity discriminated unlawfully within the meaning of section 102 of the ADA, 42 U.S.C. § 12112.

Whether a covered entity can ultimately establish a defense to liability is an inquiry separate from, and follows after, a determination that an individual was regarded as having a disability. Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled. Whether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry.

The fact that the "regarded as" prong requires proof of causation in order to show that a person is covered does not mean that proving a "regarded as" claim is complex. While a person must show, for both coverage under the "regarded as" prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment, this showing need only be made once. Thus, evidence that a covered entity took a prohibited action because of an impairment will establish coverage and will be relevant in establishing liability, although liability may ultimately turn on whether the covered entity can establish a defense.

As prescribed in the ADA Amendments Act, the regulations provide an exception to coverage under the "regarded as" prong where the impairment on which a prohibited action is based is both transitory (having an actual or expected duration of six months or less) and minor. The regulations make clear (at § 1630.2(l)(2) and § 1630.15(f)) that this exception is a defense to a claim of discrimination. "Providing this exception responds to concerns raised by employer organizations and is reasonable under the 'regarded as' prong of the definition because individuals seeking coverage under this prong need not meet the functional limitation requirement contained in the first two prongs of the definition." 2008 Senate Statement of Managers at 10; See also 2008 House Judiciary Committee Report at 18 (explaining that "absent this exception, the third prong of the definition would have covered individuals who are regarded as having common ailments like the cold or flu, and this exception responds to concerns raised by members of the business community regarding potential abuse of this provision and misapplication of resources on individuals with minor ailments that last only a short period of time"). However, as an exception to the general

rule for broad coverage under the "regarded as" prong, this limitation on coverage should be construed narrowly. 2008 House Judiciary Committee Report at 18.

> ***The relevant inquiry is whether the actual or perceived impairment on which the employer's action was based is objectively "transitory and minor," not whether the employer claims it subjectively believed the impairment was transitory and minor. For example, an employer who terminates an employee whom it believes has bipolar disorder cannot take advantage of this exception by asserting that it believed the employee's impairment was transitory and minor, since bipolar disorder is not objectively transitory and minor.*** At the same time, an employer that terminated an employee with an objectively "transitory and minor" hand wound, mistakenly believing it to be symptomatic of HIV infection, will nevertheless have "regarded" the employee as an individual with a disability, since the covered entity took a prohibited employment action based on a perceived impairment (HIV infection) that is not "transitory and minor." …

Appendix to Part 1630 — Interpretive Guidance on Title I of the Americans with Disabilities Act,  76 FR 16978, 17003, Mar. 25, 2011, 29 C.F.R. pt. 1630 app. (EEOC Guidance) [Emphasis supplied, citation supplied, footnote omitted.]

• **How to demonstrate qualification**

One way for an ADA plaintiff to prove that the he is a "qualified individual" is to show "… that he can perform the essential functions of his job without accommodation." Id. at 1256.  "In cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." Crapp v. City of Miami Beach Police Dep't, 242 F.3d 1017, 1020 (11th Cir. 2001).

• **Dealing with the 'direct threat' exception to qualification**

An employer "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." § 12113(b).  Although "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat," Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), generally "[i]t is a factual question for the jury whether [an employer's] perception [of dangerousness] was unfounded."  Josephs v. Pac. Bell, 443 F.3d 1050, 1063 (9th Cir. 2006).

> That criterion ordinarily requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job," 29 CFR § 1630.2(r) (1998), "based on medical or other objective evidence," [Bragdon v. Abbott, 524 U.S. 624, 649 (1998)], (citing School Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 288 (1987)); see 29 CFR § 1630.2(r) (1998) (assessment of direct threat "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence").

Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 569 (1999)(parallel citations omitted).

In Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1294 (10th Cir. 2000), for example, the court affirmed summary judgment for a mining company that refused to allow "an employee who worked with explosives[,] harbored a grudge against his supervisor, threatened suicide and perhaps injury to others," and got an unfavorable recommendation from an outside psychiatrist to whom the employer sent him, to return to work as a blaster. Likewise, a district court granted summary judgment on an ADA claim by a Chicago anesthesiologist who suggested in a telephone conversation that if he learned that a cancerous lesion on his lip had metastasized,  he would kill his

former supervisor and several other co-workers, <u>Bodenstab v. County of</u>
<u>Cook</u>, 539 F. Supp. 2d 1009, 1011 (N.D. Ill. 2008)[3] — but whom the Cook
County Hospital had not terminated until two psychiatrists had informed it
that, even after three months of intensive psychotherapy, he remained angry,
paranoid and a threat to others.  <u>Id</u>. at 1012-1013.

However, there was a different result in <u>Josephs</u> when a telephone
company suspended and then fired a probationary home-installation
technician after learning that he had been found not guilty by reason of
insanity of an attempted murder charge 16 years earlier and had spent two
years in what a vice president referred to as a "mental ward."  <u>Id</u>. at 1056-
1058. Summarizing that "Josephs claimed that PacBell regarded him as
suffering from a mental illness that might result in future acts of violence," <u>Id</u>.
at 1062, the court upheld a jury verdict in the plaintiff's favor, characterizing
the jury's finding as being that "Josephs was, in fact, safe and qualified, and
that PacBell's fears were objectively unreasonable and based on a
discriminatory, incorrect assumption" and observing that "[r]equiring
employers to rely on facts rather than stereotypes does not undermine
employers' ability to hire only fully qualified people."  <u>Id</u>. at 1064 & n. 5.  "If
an individual can show that an adverse employment decision was made by the
employer because of a perception of a mental impairment — whether based

---

[3]As did the plaintiff in <u>Palmer v. Circuit Court</u>, 117 F.3d 351, 352 (7th
Cir. 1997), upon which the defendant relies for the truism that threatening
to kill co-workers disqualifies one as being "otherwise qualified," Defendant's
MSJ at 12-13, the plaintiff in <u>Bodenstab</u> threatened to physically harm
specific people.

on myth, fear, or stereotype — the 'regarded as' prong of being defined as disabled under the ADA is generally satisfied." Lizotte v. Dacotah Bank, 677 F. Supp. 2d 1155, 1165 (D. N.D. 2010), citing 29 C.F.R. § 1630.2(l) (reasonable fact finder could determine that depressed bank officer, whose superior was "blown away" that he was released from a psychiatric facility only four days after a suicidal gesture, was "regarded as" having a mental impairment).

A hallmark of similar cases, both pre- and post-ADAAA, in which employers have prevailed has been the employers' involvement — or attempted involvement, coupled with the terminated employees' refusals to cooperate — of psychiatric or psychological personnel to objectively and scientifically evaluate the perceived threats.   See, e.g. Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 808 (6th Cir. 1999) (affirming summary judgment against school teacher who "allegedly engaged in disruptive and abusive verbal outbursts, shoved papers in the faces of individual members of the board, and refused to stop when asked by the board president," and who refused to submit to a mental and physical fitness-for-duty examination); Rivera v. Smith, Case No. 07 Civ. 3246, 2009 U.S. Dist. LEXIS 3523 (S.D. N.Y. Jan. 19, 2009) (summary judgment granted in termination of physician who refused to submit to examination by the New York State Committee on Physician Health in connection with harassment and stalking of nurse practitioner); cf. Garner v. Gwinnett County, Case No. 1:96-cv-3431, 1999 U.S. Dist. LEXIS 6370 (N.D. Ga. Mar. 20, 1999)(even though police officer did

not meet the pre-ADAAA definition of "regarded as" mentally ill, court noted that there was no pretext in not giving back a badge and gun to someone who had expressed homicidal ideations concerning his captain and police chief and about whose safety to return to duty mental health professionals disagreed).

• **Proving causation**

Even though an employer may not say that it is terminating a plaintiff because of "mental illness," doing so because of alleged behavior from which one can infer mental illness is the same thing.  See, e.g. Stokes v. City of Montgomery, Case No. 2:07cv686, 2008 U.S. Dist. LEXIS 73889 (M.D. Ala. Sept. 25, 2008), quoting Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 168 (2d Cir. 2003) ("an employer who terminates an employee for fear that the employee's depression will drive her to suicide has acted on the basis of a perception of disability because a 'mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself'"); see also Chandler v. Specialty Tires of Am. (Tenn.), Inc., 134 Fed. Appx. 921, 926 (6th Cir. Tenn. 2005) ("The fact that Specialty did not use the words 'mental illness' in describing the company's rationale for Chandler's termination does not lead to the conclusion that the company did not intuit some sort of perceived handicap from her attempted suicide").

• **For interpreting a faculty handbook**

Interpreting a faculty handbook is a matter of contract interpretation Univ. of Miami v. Frank, 920 So. 2d 81, 86 (Fla. Dist. Ct. App. 2006).  "[T]he goal of Florida law vis-à-vis contract formation is to effectuate the parties'

intent." Solymar Invs., Ltd. v. Banco Santander, S.A., 672 F.3d 981, 991

(11th Cir. 2012), citing Commerce Nat'l Bank v. Safeco Ins. Co. of Am., 252

So. 2d 248, 252 (Fla. 4th DCA 1971).

Under Florida law, if the terms of a contract "are clear and

unambiguous, a court must interpret the contract in accordance with its plain

meaning, and, unless an ambiguity exists, a court should not resort to outside

evidence or the complex rules of construction to construe the contract."  Key

v. Allstate Ins. Co., 90 F.3d 1546, 1549 (11th Cir. 1996), citing, among other

cases,  Rigel v. National Casualty Co., 76 So. 2d 285, 286 (Fla.1954).

> In Florida, "[i]t is a  fundamental tenet of contract law that a
> phrase in a contract is 'ambiguous' only when it is of uncertain meaning,
> and may be fairly understood in more ways than one." Emergency
> Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 2d DCA
> 1995) (quotation marks and internal citation omitted). "In the event of
> such an ambiguity, a trial court is authorized to admit parol evidence to
> explain the words used and how the contracting parties intended them
> to be interpreted." Id. (citation omitted). However, in the absence of
> such ambiguity, parol evidence is inappropriate. See Fla. Bar v.
> Frederick, 756 So. 2d 79 (Fla. 2000) (stating parol evidence is only
> admissible where a party seeking to introduce such evidence can
> establish that the document is ambiguous); Lab. Corp. of Am. v.
> McKown, 829 So. 2d 311, 313 (Fla. 5th DCA 2002). Thus, where a
> contract is facially complete and contains no ambiguous terms, Florida
> law requires those contracts be enforced in accordance with their terms.
> Accord id.; Arnold v. First Sav. & Trust Co., 104 Fla. 545, 559, 141 So.
> 608 (1932) ("It is elementary law that a contract will be construed
> according to its own clear and unambiguous terms, and that the
> construction placed upon it by the parties thereto is relevant only in
> determining the proper construction of a contract when the provisions
> thereof are ambiguous. If the contract is clear and unambiguous, the
> legal construction of it follows, regardless of what construction may
> apparently have been placed upon it by the parties.").

Solymar, 672 F.3d at 991.

Although the <u>Frank</u> court suggested that the maxim "inclusio unius, exclusio alterius" (the express mention of one thing is the exclusion of the other) might be better suited to construing statutes than contracts, 920 So.2d at 86, the Florida Supreme Court has recognized it as a tool of contract construction.  <u>See</u> <u>City of Homestead v. Johnson</u>, 760 So. 2d 80, 84 (Fla. 2000); <u>see also</u> <u>Shumrak v. Broken Sound Club, Inc.</u>, 898 So. 2d 1018, 1020 (Fla. Dist. Ct. App. 2005) ("It is a fundamental principle of contract construction..."); <u>United States v. First Nat'l Bank</u>, 513 So. 2d 179, 181 (Fla. Dist. Ct. App. 1987) ("The maxim ... applies to contracts as well as statutes").[4]

_____

[4]Courts in several other jurisdiction likewise recognize it as a maxim of contract construction. <u>See, e.g.</u> <u>National Union Fire Ins. Co. v. Circle, Inc.</u>, 915 F.2d 986, 990 (5th Cir. 1990) (stating that by drafting a release too specifically, one might "risk missing the inadvertently omitted item under the maxim"); <u>Mexican Hass Avocado Imps. Assoc. v. Preston/Tully Group Inc.</u>, 838 F. Supp. 2d 89, 96 (E.D.N.Y. 2012) and <u>Thomas v. Price</u>, 631 F. Supp. 114, 122 (S.D.N.Y. 1986), each citing <u>Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.</u>, 63 N.Y.2d 396, 403-04, 472 N.E.2d 315, 318, 482 N.Y.S.2d 465, 468 (1984) as applying doctrine in contract case; <u>Dugan v. Coastal Indus.</u>, 96 F. Supp. 2d 481, 484 (E.D. Pa. 2000) ("[i]nvoking the venerable interpretive canon <u>inclusio unius unius est exclusio alterius</u> ... seems appropriate here [to determine whether contractor or United States was responsible for cleaning up puddles on military base]"); <u>CKB & Assocs. v. Moore McCormack Petroleum, Inc.</u>, 734 S.W.2d 653, 655 (Tex. 1987) (characterizing doctrine as a "rule of contract construction"); <u>Kenney v. Clark</u>, 120 Ga. App. 16 (Ga. Ct. App. 1969) (real estate commission case in which court observed that "'Inclusio unius, exclusio alterius' is a rule as old as the civil law of the Romans, and as sensible as it is venerable").

## Applying the Law to the Facts in the Case at Bar

**Point 1:**   **Nova fired Professor Chase because it perceived him as likely to go on a shooting rampage — which was wrongfully regarding him as being mentally ill.**

As one of Professor Chase's colleagues observed in an e-mail chain[5] preceding other colleagues going to Nova's administration concerning Professor Chase's talk and e-mails about obtaining a Florida concealed-weapon permit: "His reply strikes me as vintage Tony, with the exception of the reference to his weapon, which is certainly disturbing. Tony says that he is complying with the University's regulations for weapons. Does anyone know what· those are?"

This was "Tony," the somewhat (to borrow from the vernacular) weird dude who, notwithstanding his having been a tenured professor of law since 1984, was rumored to live in his book-cluttered office, wander the hallways pre-dawn in a bathrobe, plod about barefoot, smell bad and surf "porno" sites. Once he began e-mailing and speaking to colleagues about owning a Baretta pistol and obtaining a "carry permit" pursuant to Florida's concealed-weapon statute, § 790.06, FLA. STAT. (2011), he morphed into creature whom several colleagues and Nova's administration considered capable of behavior reminiscent of the recent tragedies in, e.g., Norway and Aurora, Colorado.

---

[5] September 30, 2010 e-mail from Joel Mintz,   See Plaintiff's Response to Statement of Undisputed Material Facts, Attachment 1, NSU000459.

Following an "investigation" that, significantly, was conducted solely by a lawyer, as opposed to a mental health professional, and much of which focused on Professor Chase's alleged idiosyncracies, Nova's president fired Professor Chase, notwithstanding his lifetime tenure, stating that what Professor Chase had said and written had "created a well-founded fear by the University for the safety of its entire community." In other words, Nova's administration supposed — without any reasonable basis — that Professor Chase was about to (once again borrowing from the vernacular) "go postal." Nova has presented no admissible evidenced that even his statement about shooting into the parking lot was anything other than, as he explained, an obtuse reference to something that he had picked up at a seminar and an inside joke between him and the sole recipient.

This is a classic case of discrimination against someone whose employer "regarded" him as suffering mental illness. His expert psychologist, Glenn R. Caddy, Ph.D., testified at his deposition that it is a short leap from perceiving Professor Chase as eccentric to thinking that he is mentally ill — a perception of him that is necessary for one to think that he would got on a shooting spree.

It also is a leap that Nova took, without the assistance of mental health professionals, whose advice was a key piece in each case in which research has shown that courts have found that an employer's assessment of possible dangerousness was reasonable. Professor Chase, even with his obtuse e-mail

to a single recipient about shooting from his windowless office into the parking lot, is far more similar to the telephone technician with an ancient record of an insanity acquittal on an attempted murder charge, see Josephs, than he is to the mentally disturbed mine dynamiter, angry anesthesiologist or homicidal court clerk in Borgialli, Bodenstab or Palmer.

It was, however, a leap that was both incorrect, based on a comprehensive psychological assessment Dr. Caddy and one that Dr. Caddy thought would be easy for laymen to make based on Professor Chase's being "different."

Professor Chase, quite simply, was not dangerous, but rather was the victim of "regarded as" discrimination under the ADA and FCRA.

**Point 2:** **Nova has no mechanism in place for terminating a tenured Professor of Law.**

The American Bar Association, as a condition of accreditation, requires Nova's law school to provide its faculty with tenure — which Nova's law school faculty handbook describes as a "lifetime relationship."

What Nova does not provide, however, is any method for terminating professors with tenure, such as that recommended (but not required) by the ABA guidelines.  While it does have explicit provisions for terminating non-tenured faculty, those provisions specifically do not include tenured law school professors.  Indeed, because the appellate process envisioned by the faculty handbook forbids the presence of any professor from the appellant's own

center on the appellate panel, Chase would have had to appeal to a panel that did not even include any tenured faculty.  See DE 84-10, at 47-48.

Thus, pursuant to Florida contract law, there is no provision for Nova to have legally severed Professor Chase's "lifetime relationship" with its law school.

### Conclusion

Based on the authorities cited and the arguments presented, plaintiff, Professor Anthony Chasel, respectfully request that this Court deny defendant's motion for summary judgment in all respects.

Respectfully submitted,

/s/   William R. Amlong
WILLIAM R. AMLONG
Florida Bar No: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No: 275565
KAmlong@TheAmlongFirm.com
MICHELLE PARKER
Florida Bar No: 91196
MParker@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

**Attorneys for the Plaintiff,**
**Anthony Chase**

### Certificate of Service

I HEREBY CERTIFY that on the 30th day of July, 2012, the above and foregoing was served by U.S. Mail on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing as indicated by asterisk.

/s/   William R. Amlong
WILLIAM R. AMLONG

### Service List

**_Anthony Chase vs. Nova Southeastern University, Inc._**
**United States District Court, Southern District of Florida**
**Case No: 11-cv-61290-Williams/Seltzer**

WILLIAM R. AMLONG
Florida Bar No: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No: 275565
KAmlong@TheAmlongFirm.com
MICHELLE PARKER
Florida Bar No: 91196
MParker@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, FL 33301
(954) 462-1983

**_Attorneys for the Plaintiff,_**
        **_Anthony Chase_**

RICHARD A. BEAUCHAMP
Fla. Bar No: 471313
rbeauchamp@panzamaurer.com
DANA PANZA MACDONALD
dmacdonald@panzamauer.com
Fla. Bar No:  505315
PANZA, MAURER & MAYNARD, P.A.
Bank of America Building, Third Floor
3600 North Federal Highway
Fort Lauderdale, FL 33308
Phone: (954) 390-0100
Facsimile: (954) 390-7991

**_Attorneys for Defendant,_**
        **_Nova Southeastern University, Inc._**

\\amlong3\cpshare\CPWin\HISTORY\120710_0001\1148.1A1